## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Tiffany Cundiff, Administrator of the Estate of Talent Bradley, deceased, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 2:24-cv-00289 |
| vs. | ) ) | Judge Douglas R. Cole |
| Franklin County, Ohio, et al., | ) ) | Magistrate Judge S. Courter M. Shimeall |
| Defendants. | ) | |

## DEFENDANTS, ARMOR HEALTH OF OHIO, LLC, et al., MOTION FOR SUMMARY JUDGMENT

Defendants Armor Health of Ohio, LLC ("Armor Health of Ohio"), Asha J. Kosgey, APRN-CNP, Benjamin S. Latelle, LISW, Amy L. Garbrecht, Psy.D., MiKael White-Davis, LPC, and Deanna R. Littick, LPCC-S, MHD ("Armor Health of Ohio employees"), respectfully move this Court pursuant to Fed. R. Civ. P. 56(a) for summary judgment in their favor on all claims. The grounds in support are fully set forth in the Memorandum attached below.

Respectfully submitted,

/s/ Melvin J. Davis
Melvin J. Davis (0079224)
**Reminger Co., L.P.A.**
955 Yard Street, Suite 330
Columbus, Ohio 43212
Direct:  (614) 232-2630
Fax (614) 232-2410
mdavis@reminger.com
*Counsel for Defendants, Armor Health of Ohio, LLC, Asha J. Kosgey, APRN-CNP, Benjamin S. Latelle, LISW, Amy L. Garbrecht, Psy.D., MiKael White-Davis, LPC, and Deanna R. Littick, LPCC-S, MHD*

## MEMORANDUM IN SUPPORT

This action arises from the death of Talent Bradley ("Decedent") while detained as a pretrial inmate at the Franklin County Corrections Center I ("FCCC"). Plaintiff, Tiffany Cundriff, as Administrator of the Decedent's Estate ("Plaintiff"), alleges that various medical providers and personnel responsible for inmate healthcare at the FCCC failed to appropriately monitor and treat the Decedent's mental health condition in the months leading up to his death.

As discussed more fully below, the record does not support a finding that any remaining Armor Health of Ohio employee acted with deliberate indifference toward the Decedent's serious medical needs. To the contrary, the undisputed evidence demonstrates that the Decedent received ongoing mental health evaluations, repeated suicide-watch placements, psychiatric treatment, and continued monitoring throughout his incarceration at FCCC. Simply put, Plaintiff's claims amount to a disagreement with the clinical judgments exercised by various providers during the course of the Decedent's treatment. This is insufficient as a matter of law to establish deliberate indifference under 42 U.S.C. § 1983.

Because Plaintiff's remaining federal claims fail as a matter of law, no independent basis for federal jurisdiction remains in this case. As a result, the Court should also decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law wrongful death claims and dismiss those claims without prejudice as well. But to the extent this Court proceeds with Plaintiff's state-law wrongful death claims, Plaintiff cannot establish that any alleged act or omission by the Armor Health of Ohio employees proximately caused the Decedent's death. Plaintiff's wrongful death claims rest on speculative assertions that these employees could have prevented the Decedent's suicide despite the continued evaluations, treatment efforts, and monitoring provided during his incarceration. Moreover, the record shows that the Decedent ultimately died by hanging himself with a bedsheet while housed at FCCC despite recommendations that sheets be removed from the

Decedent's cell.  The evidence further establishes that Armor Health of Ohio's employees could not control and were not responsible for the placement of bedding materials within the jail.

For these reasons, more fully explained below, summary judgment should be entered in favor of the remaining Armor Health of Ohio employees on all claims.

## I.      STATEMENT OF FACTS

The Decedent entered the FCCC on August 12, 2021, as a pretrial detainee. (*See* Am. Compl. at ¶ 31, PageID # 139). Plaintiff testified during her deposition this was because the Decedent "was charged with two murders." (Cundiff Depo. at pg. 59:8). Shortly thereafter, the Decedent attempted suicide and was transported to Grant Medical Center for evaluation before returning to the FCCC on August 15, 2021. (*See* Am. Compl. at ¶ 31, PageID # 139). Plaintiff maintains that the Decedent did not have a history of mental health treatment or diagnosis prior to his incarceration. (*Id.*). Following his return, Plaintiff alleges that the Decedent experienced mental health issues, including suicidal ideation and hallucinations at times. (*Id.* at ¶ 32, PageID # 139-140). He was intermittently placed on suicide watch because of this. (*Id.*).

At the end of October 2021, Armor Health of Ohio became a medical provider for the FCCC. (*Id.* at ¶ 34, PageID # 140). The Decedent was seen by Armor Health of Ohio employee, Defendant Benjamin Latelle ("Latelle"), a social worker, who placed the Decedent on suicide watch on October 27, 2021, due to reported suicidal ideation and complaints of hearing voices. (*Id.*, *see also* Latelle Depo. at pg. 31:22-24, 32:1-4). The Decedent was thereafter taken off suicide watch by Gabrielle Poliseno, a professional clinical counselor, following additional mental-health evaluation and assessment. (*Id.*). On November 5, 2021, the Decedent was placed on suicide watch again by Defendant Latelle when the Decedent reported suicidal ideation. (*See* Am. Compl. ¶ 35, PageID # 140). He was eventually removed from suicide watch a few days later. (*Id.*).

On November 30, 2021, the Decedent was evaluated by independently licensed clinician Defendant Amy Garbrecht ("Garbrecht"), regarding his mental health status. (*Id.* at ¶ 36, PageID # 140; *see also* Garbrecht Depo. at pg. 24:23-24, 25:1-3). Then, a third Armor Health of Ohio employee, Defendant Mi'Kael White-Davis ("White-Davis"), spoke to the Decedent on December 24, 2021, after the Decedent was found with a noose in his cell. (*Id.* at ¶ 37, PageID # 141). He was placed on suicide watch again and thereafter removed after a consultation with Defendant Deanna Ray Littick ("Littick"). (*Id.*). Prior to the Decedent's removal from suicide watch, Defendant White-Davis discussed additional protective measures with correctional staff, including keeping the Decedent in a turtle suit and ensuring that sheets and blankets were removed from his cell as contraband. (*See* White-Davis Depo. at pg. 43:8-25; 44:1-25; 45:1). However, on December 27, 2021, the Decedent was discovered hanging in his cell and was later pronounced deceased after being transported to Grant Medical Center. (*See* Am. Compl. at ¶ 38, PageID # 141).

Plaintiff's Amended Complaint brings claims for wrongful death and alleged violations of 42 U.S.C. § 1983 against Armor Health of Ohio and several of its employees, identified above, as a result of the Decedent's death. (*Id.* at PageID # 141-147). Specifically, Plaintiff contends that these Armor Health of Ohio employees acted with deliberate indifference toward the Decedent's medical and mental health needs while he was detained at the FCCC, resulting in his death. (*Id.*). Following the Court's ruling on the Parties' Motions for Judgment on the Pleadings, the only claims that remain include deliberate indifference claims against Defendants White-Davis, Littick, Latelle, Garbrecht, and Kosgey, as well as wrongful death claims against the Armor Health Defendants. (*See* ECF No. 42, PageID # 428).

However, Plaintiff's claims amount to nothing more than disagreement with the clinical judgments exercised by various providers during the course of the Decedent's treatment. There is no

4

evidence that any remaining Armor Health Defendant deliberately ignored the Decedent's mental health status or failed to take steps to prevent the Decedent from taking his own life. Instead, the evidence demonstrates (and Plaintiff's Amended Complaint admits) that the Decedent received ongoing mental health evaluations, repeated suicide-watch placements, psychiatric treatment, and continued monitoring throughout his incarceration at FCCC. (*See* Am. Compl. at ¶¶ 33-37, PageID # 140-141; *see also* White-Davis Depo. at pg. 25:18-21; 26:1-5; Littick Depo. at pg. 61:2-8; Latelle Dep at pg. 31:22-24, 32:1-4.).

Accordingly, as discussed more fully below, Plaintiff cannot establish deliberate indifference or proximate causation as a matter of law, and summary judgment is therefore appropriate.

## II.     LAW & ARGUMENT

### A.   Summary Judgment Standard

Summary judgment should be granted when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### B. Plaintiff cannot establish a deliberate indifference claim against the remaining Armor Health of Ohio employees.

The Sixth Circuit has held that a pretrial detainee plaintiff claiming deliberate indifference under 42 U.S.C. § 1983 must show that defendants acted with recklessness regarding the detainee's

serious medical needs. *See Helphenstine v. Lewis County*, 60 F.4th 305, 316-17 (6th Cir. 2023) (*see also* ECF No. 42, PageID # 411). This includes both objective and subjective requirements. *Bryant v. Hensley*, 2024 U.S. App. LEXIS 6750, at *5 (6th Cir. Mar. 19, 2024). First, Plaintiff must establish an objectively serious medical need, one with a "substantial risk of serious harm." *Id*. Then, the subjective component requires Plaintiff to establish that "each defendant acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Est. of Bost v. Franklin Cty.*, 2023 U.S. Dist. LEXIS 207450, at *4-5 (S.D. Ohio Nov. 20, 2023), citing *Helphenstine*, 60 F.4th at 317. "This framework creates a 'demanding test' when an estate of a deceased inmate challenges [a defendant]'s failure to prevent a suicide." *Lawler v. Hardeman Cty.*, 93 F.4th 919, 929 (6th Cir. 2024), citing *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 335 (6th Cir. 2013).

Plaintiff may satisfy the objective component by showing that the Decedent suffered from "psychological needs" that led them to have "suicidal tendencies." *Lawler*, 93 F.4th at 929, citing *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994). The record reflects that the Decedent was repeatedly evaluated for mental-health concerns, repeatedly placed on suicide watch, prescribed psychiatric medication, and continuously monitored throughout his incarceration at FCCC. (*See* Am. Compl. at ¶¶ 33-37, PageID # 140-141; *see also* White-Davis Depo. at pg. 25:18-21; 26:1-5; Littick Depo. at pg. 61:2-8; Latelle Dep at pg. 31:22-24, 32:1-4.). As such, the dispute here concerns the second and far more demanding component of the analysis, the subjective requirement. *See Lawler*, 93 F.4th at 929.

The Sixth Circuit has emphasized the "caselaw sets a 'high bar'" for a Plaintiff trying to meet this subjective requirement. *Id*., citing *Downard v. Martin*, 968 F.3d 594, 597 (6th Cir. 2020). Because inmates often commit suicide "without warning," jail officials and medical providers face

6

inherent difficulty in identifying which inmates present a sufficiently immediate and substantial suicide risk. *Id.*, citing *Andrews v. Wayne County*, 957 F.3d 714, 717 (6th Cir. 2020). Thus, it is not enough for Plaintiff to show that the remaining Armor Health of Ohio employees were aware of a "possibility" or even a "likelihood" that the Decedent could harm himself. *Id.* at 934. Rather, Plaintiff must establish that each employee (1) subjectively believed there existed a "strong likelihood" that the Decedent would commit suicide and (2) nevertheless responded to that risk in an objectively unreasonable manner. *Id.* at 929.

The Sixth Circuit has found this high bar to be met only where defendants ignored highly specific and immediate evidence of suicidal intent, such as direct statements of suicidal intent coupled with recent hospitalization or active suicide-watch status. For example, when an inmate "told [the employee] that he was suicidal and needed to go to the hospital and when the [employee] knew that he had recently been released from a mental-health facility." *Id.* at 929-30, citing *Bonner-Turner v. City of Ecorse,* 627 F. App'x 400, 408-10. (6th Cir. 2015). Likewise, the high bar was met "when an [employee] knew of the inmate's past suicide attempts, knew that the inmate had recently been placed on suicide watch, and knew that the inmate was complaining of pain and crying out to go to the hospital." *Id.*, citing *Schultz v. Sillman*, 148 F. App'x 396, 401-03 (6th Cir. 2005).

However, the Sixth Circuit has repeatedly affirmed summary judgment in cases involving inmates with prior suicidal ideation where the record nevertheless reflected ongoing treatment or where the inmate denied active suicidal intent. *Id.*, citing *Mantell v. Health Professionals, Ltd.*, 612 F. App'x 302, 306-07 (6th Cir. 2015) (affirming summary judgment where inmate appeared calm and compliant, denied suicidal intent during evaluation, and providers relied upon contemporaneous clinical assessments in determining suicide-watch status); *Nallani v. Wayne County*, 665 F. App'x 498, 507-08 (6th Cir. 2016) (affirming summary judgment even where doctor knew inmate

7

previously attempted self-harm and recently expressed suicidal thoughts during arrest, because there was no active suicidal intent); *Downard v. Martin*, 968 F.3d 594, 601-02 (6th Cir. 2020) (reversing District Court's finding of subjective component being met because evidence employees "perceived some undefined risk that [inmate] might attempt suicide" is insufficient).

Here, the evidence does not support a finding that any remaining Armor Health of Ohio employee deliberately disregarded a known strong likelihood that the Decedent would imminently commit suicide. The record reflects repeated intervention, continued monitoring, ongoing evaluations, psychiatric treatment, and multiple suicide-watch placements throughout the Decedent's incarceration. (*See* Am. Compl. at ¶¶ 33-37, PageID # 140-141; *see also* White-Davis Depo. at pg. 25:18-21; 26:1-5; Littick Depo. at pg. 61:2-8; Latelle Dep at pg. 31:22-24, 32:1-4.). The remaining Armor Health of Ohio employees did not ignore the Decedent's condition, they actively treated it. (*Id.*) At most, Plaintiff here disagrees with the adequacy of the treatment decisions and contends that different clinical judgments should have been made. (*See* Am. Compl. at PageID # 141-147). This is insufficient.

The Armor Health of Ohio employees were not required to perfectly predict or prevent future acts of self-harm. As explained above, the relevant inquiry is whether each individual Defendant *deliberately failed* to take reasonable steps in the face of a known or obvious substantial risk of serious harm. The undisputed evidence demonstrates that they did not. For these reasons, Plaintiff cannot establish that any remaining Armor Health of Ohio employee deliberately failed to take steps to prevent the Decedent from harming himself.

### 1. Plaintiff cannot establish deliberate indifference against Defendant Benjamin Latelle.

Plaintiff cannot establish deliberate indifference against Defendant Latelle. The record demonstrates that Defendant Latelle responded to the Decedent's reported symptoms and took

affirmative steps to address the Decedent's mental health concerns. Specifically, Defendant Latelle met with the Decedent on October 27, 2021, where he recognized the Decedent required mental-health intervention and immediately placed him on suicide watch in response to his presentation and reported hallucinations. (Latelle Depo. at pg. 31:22-24, 32:1-4). This contemporaneous assessment demonstrates that Defendant Latelle did not ignore the Decedent's condition or deliberately fail to respond to signs of self-harm. Specifically, Defendant Latelle testified as follows:

> **A. I remember seeing him one time. I can – it's five years ago so only one time that I can remember like –**
>
> Q. Tell me what you remember about that encounter?
>
> **A. He wasn't right. I mean, he was saying he was hearing voices. Talking to him was like talking to someone through a tunnel like he was disassociated. You could tell he needed to talk to somebody.**
>
> Q. Was he at the time on suicide watch?
>
> **A. I put him on watch.**
>
> Q. Based on that interaction?
>
> **A. Yes.**

(Latelle Depo. at pg. 31:22-24, 32:1-4).

The Decedent was thereafter taken off suicide watch by professional clinical counselor Gabrielle Poliseno. (*See* Am. Compl. at ¶ 35, PageID # 140). However, determinations regarding removal from suicide watch involved consideration of protective factors and a more in-depth mental-health assessment to determine whether continued placement remained clinically necessary.

> Q. Okay. So using the protective factors and other information on the form you go through a more in depth assessment with them to determine if they should be taken off suicide watch?
>
> **A. Yes.**

9

(Latelle Depo. at pg. 34:17-21).

Moreover, Defendant Latelle had no involvement in the decision to remove Decedent from suicide watch in December 2021.

> Q. Did you play any role in the decision to take Talent Bradley off suicide watch in December –
>
> **A. No.**

(*Id,* pg. 43:21-24).

These facts demonstrate that Defendant Latelle repeatedly responded to the Decedent's reported symptoms and took affirmative steps to address concerns regarding self-harm. Far from acting unreasonably or deliberately failing to take steps to prevent Decedent's suicide, Defendant Latelle personally placed the Decedent on suicide watch on multiple occasions in direct response to the Decedent's presentation, reported suicidal ideation, and complaints of hearing voices. (Latelle Depo. at pg. 31:22-24, 32:1-4). The record therefore establishes that Defendant Latelle recognized the Decedent's mental-health concerns and affirmatively responded by implementing heightened monitoring and suicide precautions.

Further, the record reflects that subsequent decisions regarding the Decedent's removal from suicide-watch status were made following additional evaluation and more in-depth assessment by other mental-health professionals. (Latelle Depo. at pg. 34:17-21). Defendant Latelle did not control those later determinations and played no role in the decision to remove the Decedent from suicide watch in December 2021. (*Id,* pg. 43:21-24). Thus, Plaintiff's claim against Defendant Latelle ultimately amounts to disagreement with the clinical judgments exercised by various providers regarding the duration and necessity of continued suicide-watch placement. However, as explained above, this is insufficient.

10

There is no evidence that Defendant Latelle ignored the Decedent's complaints, denied treatment, or consciously disregarded a known substantial risk of serious harm. As such, no reasonable jury could conclude that Defendant Latelle deliberately failed to take steps to prevent the Decedent from harming himself or otherwise acted recklessly in the face of a known substantial risk of serious harm. Summary judgment should therefore be entered in favor of Defendant Latelle on Plaintiff's deliberate indifference claim.

### 2. Plaintiff cannot establish deliberate indifference against Defendant Amy Garbrecht.

Plaintiff similarly cannot establish deliberate indifference against Defendant Garbrecht. Defendant Garbrecht, an independently licensed clinician met with the Decedent once on November 30, 2021. (*See* Am Compl. ¶ 36, PageID # 140-141; *see also* Garbrecht Depo. at pg. 24:23-24, 25:1-3). In denying the Motion for Judgment on the Pleadings as to Defendant Garbrecht, the Court relied upon Plaintiff's allegation that Defendant Garbrecht "failed to properly assess" the Decedent and "did not address his history of suicide attempts." (*See* ECF No. 42, PageID # 414).

First, Plaintiff's criticisms regarding the adequacy of the evaluation or the questions asked during the encounter sound, at most, in negligence or malpractice. (*See Id*). Plaintiff's allegations against Defendant Garbrecht relate to retrospective disagreement with the clinical judgment exercised during a single mental-health encounter. (*Id*). This is insufficient as a matter of law to establish deliberate indifference.

Second, there is no evidence that Defendant Garbrecht ignored the Decedent's mental health concerns, denied treatment, or deliberately failed to take steps to prevent self-harm. To the contrary, the undisputed record demonstrates that Defendant Garbrecht met with the Decedent regarding his condition and exercised professional judgment during the course of that encounter. (*See* Am Compl. ¶ 36, PageID # 140-141; *see also* Garbrecht Depo. at pg. 24:23-24, 25:1-3). Defendant Garbrecht

11

did not maintain continuous responsibility for the Decedent's treatment and did not control the Decedent's housing status. (*Id.*). Further, Defendant Garbrecht testified that she played no role in the decision to remove Decedent from suicide watch:

Q. Now, did you play any role in the decision to take Talent Bradley off safety watch?

**A. I did not.**

(Garbrecht Depo. at 56:16-18).

Accordingly, Plaintiff cannot establish that Defendant Garbrecht deliberately disregarded a known substantial risk of serious harm by later decisions regarding the Decedent's suicide-watch status that she neither controlled nor participated in. The fact that Defendant Garbrecht's initial meeting with the Decedent ultimately did not prevent the later suicide does not retroactively transform that encounter into deliberate indifference. For these reasons, Plaintiff cannot establish deliberate indifference against Defendant Garbrecht.

### 3. Plaintiff cannot establish deliberate indifference against Defendant Mi'Kael White-Davis.

Plaintiff alleges that Defendant White-Davis evaluated the Decedent on December 24, 2021, after the Decedent was discovered with a noose in his cell, and placed him on suicide watch. (*See* Am. Compl. at ¶ 37, PageID # 141). Plaintiff alleges Defendant White-Davis then removed him from suicide-watch status the following day after consultation with Defendant Littick, Director. (*Id.*) At the pleading stage, the Court concluded that those allegations were sufficient to plausibly infer recklessness against Defendant White-Davis because the Decedent was removed from suicide watch one day after being found with a noose in his cell.  (*See* ECF No. 42, PageID # 414).

However, the record now before the Court demonstrates that Defendant White-Davis did not deliberately fail to take steps to prevent the Decedent from taking his own life. Defendant White-Davis responded directly to the Decedent's condition by evaluating him, placing him on suicide

watch, monitoring his condition, and exercising clinical judgment regarding his treatment and suicide-watch status. (*See* Am. Compl. at ¶ 37, PageID # 141).

> Q. So when you -- so you came back to do an evaluation on Mr. Bradley subsequently; is that right?
>
> **A. That's correct**.
>
> Q. When you do an evaluation like that, what all do you look at?
>
> **A. We look at how long they've been on suicide watch. We look at their demeanor, how they are responding and reacting. We assess for what they are saying according to the questions that we actually offer up to them. So we take into consideration body language, eye contact, how verbal they are with us, that kind of thing.**

(White-Davis Depo. at pg. 25:18-21; 26:1-5).

This shows that Defendant White-Davis exercised professional judgment in evaluating the Decedent's condition and determining whether continued suicide-watch placement was clinically indicated. (*Id*.). She responded directly to the Decedent's condition by evaluating him, placing him on suicide watch, and participating in ongoing mental health monitoring and treatment efforts. (*Id*., *see also* Am. Compl. at ¶ 37, PageID # 141).

Further, the record demonstrates that Defendant White-Davis was actively attempting to address the Decedent's concerns and improve his condition rather than deliberately disregarding his mental health needs.

> **A. He just -- he said that he wasn't suicidal, that he wanted to be able to meet with his -- he wanted to be able to meet and visit with his mother and his grandmother and his sister and he felt like I was taking that away from him.**
>
> Q. Understood. Do you know if he subsequently was able to meet with them?
>
> **A. Yes, he was.**

(White-Davis Depo. at pg. 25:1-8).

13

This testimony undermines Plaintiff's deliberate indifference claim. Rather than ignoring the Decedent or refusing to respond to his concerns, the evidence reflects that Defendant White-Davis was evaluating the Decedent's mental state, considering his requests, and working within their clinical judgment to address his needs. (*Id.*).

Moreover, Defendant White-Davis testified that, before the Decedent was removed from suicide watch, she discussed additional protective measures with correctional staff to reduce the risk of self-harm. Specifically, Defendant White-Davis testified as follows:

Q. And if you recall, I mean, do you remember, you know, what really, you know, led you to make the decision that Mr. Bradley should be taken off suicide watch?

**A. It was a -- there were quite a few factors. The first factor was that he was no longer endorsing suicide. The second factor was the fact that his family wanted to come visit and that would have -- he was close to the women in his family, and so they were coming to visit and he really wanted to visit with them at that time. So that was a protective factor. And also the fact that I had done the full protocol that was required by Armor Health and our ethics and I had gotten supervision surrounding taking him off of suicide watch as well.**

**And, lastly, I had actually spoken with the sheriff's deputy about taking him off of suicide watch and what were some protective factors that we could put in place, such as keeping him in the turtle suit and removing any sheets, blankets that he may have had in his cell.**

Q. Okay. Do you know if he was kept in a turtle suit?

**A. He was, yes.**

Q. And that's when he went back into his single cell that no longer had suicide observation?

**A. Correct.**

(White-Davis Depo. at pg. 43:8-25, 44:1-10).

14

These additional safety measures further demonstrate that Defendant White-Davis did not deliberately fail to take steps to prevent self-harm, but instead actively considered and implemented precautions designed to reduce the risk of suicide.

Q. And there would not have been any sheets in that cell?

**A. There were no sheets in the cell. The sheriff -- the managing sheriff or supervising sheriff on duty, the deputy on duty at the time, we talked and he put the sheets for Mr. Bradley -- he listed those as contraband so Mr. Bradley would not get any sheets for as long as those were listed as contraband for him.**

Q. Oh, I see. And did you actually observe that there were no sheets in his new cell?

**A. I did.**

(White-Davis Depo. at pg. 44:15-25, 45:1).

Far from evidencing deliberate indifference, this testimony demonstrates that Defendant White-Davis engaged in a reasoned and individualized assessment regarding Decedent's suicide-watch status and implemented additional safeguards specifically designed to reduce the risk of self-harm even after Decedent was removed from formal suicide observation. (*Id.*).

Indeed, the undisputed record reflects that Defendant White-Davis evaluated Decedent, placed him on suicide watch, monitored his condition, considered protective measures, and participated in continued mental-health treatment efforts. (*Id*). No reasonable jury could conclude that Defendant White-Davis consciously disregarded a known substantial risk of serious harm where the evidence instead demonstrates repeated intervention and continued efforts to address Decedent's condition. Such conduct is fundamentally inconsistent with the notion that Defendant White-Davis deliberately failed to take steps to prevent the Decedent from taking his own life.

Accordingly, Plaintiff cannot establish that Defendant White-Davis acted recklessly in the face of an unjustifiably high risk of harm, and summary judgment should therefore be entered in her favor.

### 4. Plaintiff cannot establish deliberate indifference against Defendant Deanna Ray Littick.

The deliberate indifference claim against Defendant Littick similarly fails as a matter of law. Discovery has confirmed that Defendant Littick's involvement with the Decedent was limited and supervisory in nature. (Littick Depo. at pg. 14:23-25) (explaining that she never met the Decedent). The extent of Defendant Littick's involvement was the single phone call regarding the Decedent's status after the Decedent had already been evaluated by other providers. (*Id.*).

Q. Did you speak with [Defendant White-Davis] before [the Decedent] was removed off safety watch?

**A. Yes.**

Q. And were you comfortable with [the Decedent] being removed off safety watch based on information that [Defendant White-Davis] provided you?

**A. Yes.**

(Littick Depo. at pg. 61:2-8).

This testimony confirms that Defendant Littick relied upon the contemporaneous observations, evaluation, and clinical assessment performed by Defendant White-Davis, who had personally talked to the Decedent. (*Id*, *see also* White-Davis Depo. at pg. 43:8-25, 44:1-10). Defendant Littick did not ignore the Decedent's condition, refuse treatment, or deliberately fail to respond to known suicidal behavior. Instead, she participated in a supervisory consultation based upon information provided by the treating provider who had directly assessed the Decedent's presentation and condition. (*Id*).

Further, the evidence demonstrates that the Decedent remained subject to ongoing mental health monitoring and treatment throughout his incarceration, including repeated suicide-watch placements and evaluations by multiple other providers. (*See* Am. Compl. at ¶¶ 33-37, PageID #

16

140-141). Plaintiff cannot establish deliberate indifference merely because Defendant Littick participated in clinical decision-making regarding the Decedent's treatment.

For these reasons, summary judgment should be entered in favor of Defendant Littick.

### 5. Plaintiff cannot establish deliberate indifference against Defendant Asha Kosgey.

Finally, Plaintiff cannot establish deliberate indifference against Defendant Kosgey. In denying the Motion for Judgment on the Pleadings as to Defendant Kosgey, the Court opined that it was "reasonable to infer that Plaintiff alleges Kosgey failed to address [the Decedent]'s medication needs in the weeks and months before his suicide." (*See* ECF No. 42, PageID # 415). However, the record demonstrates that Defendant Kosgey actively treated the Decedent's mental health condition rather than deliberately disregarding it.

Defendant Kosgey, a nurse practitioner, visited the Decedent on three separate occasions during his first two months at FCCC and prescribed psychiatric medication during that period. (*See* Am Compl. ¶ 33, PageID # 140). These actions are fundamentally inconsistent with deliberate indifference. Indeed, Defendant Kosgey actively participated in the Decedent's treatment by evaluating his condition, prescribing medication, and monitoring his mental health symptoms. (*Id*.).

Importantly, Plaintiff's claim against Defendant Kosgey is premised almost entirely upon the fact that the Decedent's suicidal ideation and hallucinations allegedly continued despite treatment. (*Id.*). But the continuation of symptoms despite ongoing treatment does not establish that Defendant Kosgey deliberately failed to respond to the Decedent's medical needs. Rather, it reflects the unfortunate reality that mental health treatment does not guarantee successful outcomes, particularly where a detainee is facing severe stressors, such as being "arrested and charged with two murders." (Cundiff Depo. at pg. 59:8).

17

At most, Plaintiff contends that different medications, additional interventions, or alternative treatment measures should have been utilized. (*See* Am. Compl. at PageID # 141-147). But as explained above, allegations concerning the adequacy of medication management or treatment decisions do not establish deliberate indifference.

Accordingly, summary judgment should be entered in favor of Defendant Kosgey.

### C. Because Plaintiff's federal claims fail, the Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.

If the Court dismisses Plaintiff's remaining claims under 42 U.S.C. § 1983, no independent basis for federal jurisdiction remains in this matter. Under 28 U.S.C. § 1367, a federal court may decline to exercise supplemental jurisdiction once all claims over which it possessed original jurisdiction have been dismissed. *See Lavrenchuk v. Red Roof Inn, Inc.*, 2025 U.S. Dist. LEXIS 256649, at *7 (S.D. Ohio Dec. 11, 2025), citing 28 U.S.C. § 1367(c)(3). The Sixth Circuit has made clear that "[i]f the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Id.*, citing *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009).

Here, Plaintiff's federal deliberate indifference claims against Defendants White-Davis, Littick, Latelle, Garbrecht, and Kosgey fail as a matter of law for the reasons set forth above. The remaining state-law claims involve issues of Ohio wrongful death common law that are more appropriately resolved by Ohio courts. As such, to the extent the Court determines that any portion of Plaintiff's state-law wrongful death claim survives summary judgment, the Court should decline to exercise supplemental jurisdiction over such claims.

Accordingly, because Plaintiff cannot establish deliberate indifference against the remaining Armor Health of Ohio employees under § 1983, the Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law wrongful death claims and dismiss those claims without prejudice.

18

**D. Even if the Court retains jurisdiction, Plaintiff's wrongful death claim fails because Plaintiff cannot establish proximate cause.**

To establish a claim for a claim for wrongful death, a plaintiff must show: (1) the existence of a duty, (2) breach of that duty, (3) the breach proximately caused injury or death, and (4) damages. *Michalek v. Ohio State Univ. Wexner Med. Ctr.*, 2024-Ohio-1889, ¶ 38 (10th Dist.), citing *Cromer v. Children's Hosp. Med. Ctr.*, 2015-Ohio-229, ¶ 23. Even assuming arguendo that the Court retains supplemental jurisdiction over Plaintiff's wrongful death claim, the claim nevertheless fails as a matter of law because Plaintiff cannot establish proximate cause. Under Ohio law, proximate cause cannot be established through speculation or conjecture. *See Nance v. Univ. Emergency Specialists, Inc.*, 2009-Ohio-2133, ¶ 31 (8th Dist.). Rather, Plaintiff must establish that Defendants' alleged acts or omissions directly and proximately caused the Decedent's death. *Cromer*, 2015-Ohio-229 at ¶ 23.

Here, Plaintiff's theory necessarily depends upon speculation that different clinical decisions, additional treatment, or continued suicide-watch placement would have prevented the Decedent from ultimately taking his own life. (*See* Am. Compl. at ¶¶ 33-37, PageID # 140-141). However, the undisputed record demonstrates that the Decedent received repeated mental health evaluations, psychiatric treatment, suicide-watch placements, and continued monitoring throughout his incarceration at FCCC. (*See* Am. Compl. at ¶¶ 33-37, PageID # 140-141; *see also* White-Davis Depo. at pg. 25:18-21; 26:1-5; Littick Depo. at pg. 61:2-8; Latelle Dep at pg. 31:22-24, 32:1-4.).

For example, Defendant Latelle placed Decedent on suicide watch on multiple occasions after Decedent reported suicidal ideation and hallucinations. (Latelle Depo. at pg. 31:22-24; 32:1-4). Moreover, Defendant White-Davis testified that, before the Decedent was removed from suicide watch, she (1) consulted with Defendant Littick, (2) evaluated protective factors, (3) coordinated with correctional officers regarding additional precautions, (4) ensured the Decedent remained in a turtle suit, and (5) confirmed that sheets and blankets had been removed from the Decedent's cell as

19

contraband. (White-Davis Depo. at pg. 43:8-25; 44:1-25; 45:1). Defendant White-Davis specifically testified that she personally observed there were no sheets in Decedent's cell after those precautions were implemented. (*Id*.). These facts fundamentally undermine Plaintiff's theory that the remaining Armor Health Defendants failed to take reasonable steps to address Decedent's mental-health condition or prevent self-harm.

Importantly, there is no evidence establishing that any remaining Armor Health Defendant possessed the ability to prevent the Decedent's actions or that any specific alleged act or omission directly caused the Decedent's death. Plaintiff instead relies upon hindsight criticism of the clinical judgments exercised by various providers and speculation regarding what additional measures might have altered the outcome. (*See* Am. Compl. at PageID # 141-147). Such speculation is insufficient to establish proximate causation under Ohio law.

Finally, the record demonstrates that the Decedent ultimately died by hanging himself with a bedsheet while housed within the FCCC. (Littick Depo. at pg. 61:18). Yet, Defendant White-Davis had specifically discussed additional suicide precautions with correctional staff, including ensuring Decedent remained in a turtle suit and that sheets and blankets were removed from his cell as contraband. (White-Davis Depo. at pg. 43:8-25; 44:1-25; 45:1). Importantly, according to Major Carl Trowbridge of the Franklin County Sheriff's Office, the authority to control, distribute, or remove inmate bedding materials rested with correctional staff, not the remaining Armor Health Defendants.

Q. Who is responsible for actually removing the bedsheets physically?

**A. Deputy Sherriff.**

(Trowbridge Depo. at pg. 25:18-21; 26:1-5).

20

Thus, even assuming arguendo Plaintiff could establish deficiencies in the Decedent's mental-health treatment, Plaintiff still cannot establish that any alleged act or omission by the remaining Armor Health Defendants directly caused the Decedent's death or that they possessed the ability to physically prevent the Decedent from utilizing materials available within the jail to harm himself. (*Id.*). This further underscores the speculative nature of Plaintiff's causation theory.

At most, Plaintiff's allegations sound in disagreement with clinical judgment, not evidence that Defendants proximately caused the Decedent's death. Accordingly, Plaintiff's wrongful death claim fails as a matter of law, and summary judgment should be entered in favor of the remaining Armor Health Defendants.

### III.     CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of the remaining Armor Health of Ohio employees on all claims.

Respectfully submitted,

*/s/ Melvin J. Davis*
Melvin J. Davis          (0079224)
**Reminger Co., L.P.A.**
955 Yard Street, Suite 330
Columbus, Ohio 43212
Direct:  (614) 232-2630
Fax (614) 232-2410
mdavis@reminger.com
*Counsel for Defendants, Armor Health of Ohio, LLC, Asha J. Kosgey, APRN-CNP, Benjamin S. Latelle, LISW, Amy L. Garbrecht, Psy.D., MiKael White-Davis, LPC, and Deanna R. Littick, LPCC-S, MHD*

21

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed on May 26, 2026, via the Court's CM/ECF system and that service will be accomplished via the Court's CM/ECF system.

/s/ *Melvin J. Davis*
Melvin J. Davis (0079224)